UNITED STATES of America,
Plaintiff-Appellee,

v.

Michelle Monroe MORGAN,
Defendant-Appellant.

No. 85–5151.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1986.

Decided Dec. 9, 1986.

Brian Hennigan, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Samuel Jackson, Santa Monica, Cal., for defendant-appellant.

Before ALARCON, BRUNETTI, and NOONAN, Circuit Judges.

ALARCON, Circuit Judge:

Defendant/appellant Michelle Morgan (hereinafter Morgan) was convicted after a trial by jury of theft from a savings and loan association, in violation of 18 U.S.C. § 2113(b) (1982), conspiracy to commit theft in violation of 18 U.S.C. § 371 (1982), and transporting in interstate commerce money or property obtained by fraud, in violation of 18 U.S.C. § 2314 (1982). This matter presents an issue of first impression to our circuit. We must decide whether a person who fraudulently induces an employee of a federally insured savings and loan association to transfer the funds of a depositor to an account in an uninsured bank with the intent to convert money is guilty of a violation of 18 U.S.C. § 2113.

Morgan seeks reversal on the following grounds:

One. The evidence is insufficient to show a taking and carrying away from a federally insured savings and loan association.

Two. The government failed to prove the crime of obtaining money by false pretenses from a federally insured savings and loan association because title to the money in Kaplan's account at American Savings and Loan Association (hereinafter ASL) did not pass until after the transfer of the funds to Farmer's and Merchant's Bank (hereinafter FMB), an uninsured bank.

Three. The Krugerrand coins transported in interstate commerce were not stolen property as required by 18 U.S.C. § 2314. We disagree and affirm.

## I. PERTINENT FACTS

Morgan met Kip Walker (hereinafter Walker) while they both were employed as stock brokers at the Smith Barney Company in 1980. At the time of the alleged offenses, Morgan was a self-employed financial planner. In 1983, Walker was employed as investment officer by the Financial Corporation of America Asset Management (hereinafter FCAAM). The parties stipulated that FCAAM is a subsidiary of ASL and that ASL is a federally insured savings and loan association.

ASL issued "jumbo" certificates of deposit for depositors wishing to earn interest on investments of $1 million or more. FCAAM and its employees were responsible for finding such investors and managing their accounts. The depositors' investment funds were delivered into the possession of ASL. Money transferred from certificate of deposit accounts came from funds in the care, custody, control, and possession of ASL.

Walker's duties for FCAAM included the management of ASL certificate of deposit accounts.

Morgan and Walker began referring business to each other in 1983. Morgan referred Irving Roswell (hereinafter Roswell) to Walker. As a result, Walker became the manager of the Roswell account. Walker encountered problems in wiring funds in connection with the Roswell account. He discussed this matter with Morgan. During this conversation, Walker

revealed to Morgan the type of information that was necessary to effect a wire transfer from ASL of money credited to a client's account.

In June, 1983, Walker introduced one of his FCAAM clients, Michael Kaplan (hereinafter Kaplan) to Morgan. Morgan was informed by Walker that Kaplan was looking for a good tax shelter and had several million dollars to invest. Morgan was also informed that Kaplan had invested $1 million in an ASL certificate of deposit account. This account was managed by Walker. Morgan was unsuccessful in her attempt to become Kaplan's financial planner.

Morgan met Steven Bourque (hereinafter Bourque) in 1983. They became partners in an enterprise involving the sale of newspaper advertising through telephone solicitation.

In January, 1984, Morgan told Bourque that she had devised a plan to obtain a large amount of money without revealing her true identity through the transfer of funds from Kaplan's certificate of deposit account by means of a series of telephone calls. She explained that she had learned how FCAAM employees transferred funds when requested by ASL depositors. The plan could not be carried out without the participation of a man falsely identifying himself as Kaplan. Bourque agreed to participate in Morgan's scheme.

In furtherance of this agreement, Bourque telephoned Monex International (hereinafter Monex). Monex sells foreign currency. Bourque identified himself as Michael Kaplan. Bourque asked a Monex employee to explain the procedure he should follow to effect a large purchase of gold Krugerrands through a wire transfer of funds. Bourque was told to transfer sufficient funds to cover the amount of currency he wished to purchase to the Monex account at FMB in Newport Beach, California. In furtherance of Morgan's scheme Bourque opened an account at FMB in the name of Michael Kaplan.

In early February, 1984, Bourque called FCAAM and asked to speak to Walker. Bourque told Walker he was Jack Hoffman. He stated he had a large amount of money to invest. Walker agreed to meet him at a hotel. Walker, believing he was meeting an affluent prospective client, went to the hotel. While Walker was out of the office, Bourque, after identifying himself as Kaplan, told an FCAAM employee that he needed the account number of his certificate of deposit and its expiration date to furnish to his accountant for tax planning purposes. Bourque testified that Walker was lured from his office at FCAAM because Morgan and Bourque believed that Walker could identify Kaplan's voice and would suspect Bourque was falsely impersonating a depositor for improper purposes.

Bourque then called FCAAM, and, impersonating Kaplan, spoke to an assistant account manager responsible for providing information or service during Walker's absence from the office. Bourque gave the FCAAM employee the number of Kaplan's certificate of deposit account and requested the transfer of $1 million to the Kaplan account at FMB. The FCAAM employee arranged for a wire transfer of the money as requested by Bourque. The transfer reflected that the funds were sent to FMB by ASL.

Bourque then telephoned Monex, identified himself as Michael Kaplan, and ordered 780 gold Krugerrands. Bourque told the Monex employee that sufficient money to cover the purchase was being wired from ASL to FMB. Bourque was advised that the coins would be ready for delivery in a couple of days. A Monex representative called FMB to confirm that the purchase money had been transferred from ASL. After notice of the transfer was received by FMB, an employee of that bank called ASL to verify that the funds had been transferred to the FMB Kaplan account. Upon verification, FMB deposited the funds in Monex's account.

On February 14, 1984, Bourque, posing as Kaplan, telephoned Monex and made arrangements for delivery of the coins to a limousine driver who would use the password "Robin Hood." Bourque telephoned a limousine service and engaged the servic-

es of a driver for the delivery of the coins. The limousine driver was instructed to go to the Registry Hotel. There, Bourque gave the driver a letter authorizing him to accept delivery. The driver was also informed that the password was Robin Hood. The letter was signed "Michael Kaplan." A notary public had placed his seal on this document after being presented a forged birth certificate.

Morgan went to the Monex office to monitor the limousine driver's behavior. The driver presented the letter to Monex representatives. The coins were presented to the driver. Morgan followed the driver in her red Jaguar. The driver delivered the gold Krugerrands to Bourque at the Registry Hotel.

Monex hired a private detective to observe and follow the limousine driver. The private detective saw a woman in a red Jaguar with license number 1GMB956 follow the limousine driver. The parties stipulated at trial that the red Jaguar was registered to Morgan.

On February 15, 1984, Bourque drove to Las Vegas, Nevada, with some of the coins. Morgan flew there the next day and met him at the Sands Hotel. They went to various coin dealers' shops where Bourque sold some of the Krugerrands, while Morgan waited outside.

Morgan and Bourque returned to California with the remainder of the coins, and the proceeds from the sale. The remaining coins were stored in Kenneth Lee's safe. Kenneth Lee was Morgan's boyfriend.

When the crime was discovered, the Kaplan account at FMB was frozen. Morgan and Bourque sought to sell more of the coins. Morgan contacted Walker and told him she had Krugerrands for sale, given to her for transporting drugs. Walker notified ASL's investigators.

## II. DISCUSSION

### A. Sufficiency Of The Evidence Of A Taking And Carrying Away From A Savings And Loan Association

Morgan contends that the evidence is insufficient to show a taking and carrying away from a federally insured savings and loan association as required by 18 U.S.C. § 2113. She argues that the evidence shows that "any purported taking and carrying away was not from ASL, but was from the Farmer's and Merchant's Bank located in Newport Beach." Morgan claims that we must reverse the conviction on each count, because the government failed to prove that FMB is a federally insured institution. Morgan's argument ignores the legal effect of the evidence showing that ASL's employees and agents were induced to transfer $1 million in their care, custody, control, and management solely because Bourque falsely identified himself as Michael Kaplan.

In reviewing a challenge to the sufficiency of the evidence, "we must determine whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendant[ ] guilty beyond a reasonable doubt of each essential element of the crime charged." *United States v. Douglass,* 780 F.2d 1472, 1476 (9th Cir.1986) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

Morgan's attack on the sufficiency of the evidence is premised on the false assumption that "movement of moneys that are the subject of all the counts of the indictment was made from the FCA Asset Management Corporation (FCAAM), a subsidiary of ASL as to which no proof of federal insurance was attempted."

As summarized above, the evidence shows that ASL, a federally insured savings and loan institution, had the care, custody, control, and possession of the money invested by Kaplan in the jumbo certificate of deposit. While it is quite true that ASL's subsidiary, FCAAM, had management responsibilities for the Kaplan account, FCAAM did not have care, custody, control, or possession of the money deposited by Kaplan. In her opening brief, Morgan concedes that FCAAM's role in this type of transaction is solely that of "a mere money management service." There

is no evidence in the record that FCAAM was the custodian of Kaplan's funds.

18 U.S.C. § 2113, provides in pertinent part:

(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5000 or imprisoned not more than ten years....

 We are satisfied that after viewing the prosecution's evidence in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt that Kaplan's money was in the care, custody, and control of ASL, a federal savings and loan association.

Morgan also argues that "[t]he crime charged was not completed until the money was taken and carried away from the Farmer's and Merchant's Bank in Newport Beach."

Morgan asserts that "[t]he government has charged her with aiding and abetting the crime of false pretenses, the acquisition of title to property of another through trickery." We have reviewed the indictment with care. We find no reference to the crime of false pretenses. Instead, the language used in the indictment mirrors the text of 18 U.S.C. § 2113(b).

Count Two of the indictment reads as follows:

On February 10, 1984, in Los Angeles County, California, within the Central District of California, a person took and carried away, with intent to steal and purloin, money of a value exceeding one hundred dollars ($100.00), belonging to, and in the care, custody, control, management, and possession of American Savings and Loan Association, 6418 Wilshire Boulevard, Los Angeles, California, a savings and loan whose deposits were then insured by the Federal Savings and Loan Insurance Corporation.

At the above time and place, defendant Michelle Monroe Morgan aided, abetted, counseled, induced and procured the commission of the offense alleged above.

Morgan argues that the evidence shows that the transfer of funds was from the FCAAM account of Michael Kaplan to an account in the name of Michael Kaplan in the FMB. Therefore, it is argued by Morgan, "[a]ny crime that was committed was committed when the funds were withdrawn from the Farmer's and Merchant's Bank of Newport Beach."

Morgan's argument must fail on several grounds. First, the statute does not require that the evidence show that the thief acquire title to the property where the taking is effected by means of false pretenses. Section 2113(b) makes it a crime to take and carry away property that is in the care, custody, control, or possession of a savings and loan association.

At common law, the distinction between a taking of personal property from the possession of another through trickery and the acquisition of title personally through such false presentences was of critical importance.

 Common law larceny was limited to a taking and carrying away from the possession of the owner without consent or with his consent as the result of a trick or false pretense. *Bell v. United States*, 462 U.S. 356, 358–60, 103 S.Ct. 2398, 2400–01, 76 L.Ed.2d 638 (1983). The acquisition of title to property from the owner by false pretenses was not a crime at Common Law. "Statutory crimes such as embezzlement and obtaining property by false pretenses therefore were created to fill this gap." *Bell*, 462 U.S. at 359, 103 S.Ct. at 2400 (citing W. LaFave & A. Scott, *Criminal Law*, 618–22 (1972)). In *Bell*, the Supreme Court stated that Congress intended section 2113(b) to go beyond the common law definition of larceny, and include other theft offenses such as false pretenses. *Bell*, 462 U.S. at 360, 103 S.Ct. at 2401. Under the statute, the crime is complete whether the property that is taken and carried away "belong[s] to 'the savings and loan association, or if it is simply' in the care, custody, control, management, or pos-

session" of such institution. The evidence is sufficient to convince a reasonable jury beyond a reasonable doubt that Morgan aided and abetted Bourque in obtaining funds in the care, custody, control, and possession of ASL through trickery.

█ The crime was complete when Morgan and her accomplice fraudulently directed an FCAAM employee to transfer Kaplan's funds out of the possession of ASL through the trick of falsely impersonating a depositor.

█ We recognize that the transfer of Kaplan's funds from ASL's custody to FMB was accomplished by telephone without the direct exercise of physical control or any touching of the funds by Bourque or his accomplice. The taking and carrying away of the property of another by an innocent agent, acting at the direction of a person who falsely claims to be the owner, is attributable to the imposter. W. LaFave & A. Scott, *Criminal law*, at 715 (2nd ed. 1986). For example, if a person switches tags on the baggage of another, thereby causing a carrier to transport the property to the person identified on the false tag, the taking and carrying away of the innocent carrier is attributable to the person responsible for the trickery. *Aldrich v. People*, 224 Ill. 622, 79 N.E. 964 (1906). See cases cited in W. LaFave & A. Scott, *Criminal Law*, at 716 n. 16 (2nd ed. 1986). *See also United States v. Johnson*, 706 F.2d 143 (5th Cir.), *cert. denied*, 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1395 (1983) (evidence of taking by false pretenses under 18 U.S.C. § 2113(b) was sufficient to sustain a conviction where the defendant telephoned a bank and an employee to wire funds to another bank by impersonating depositor). Bourque, through the use of deception, directed an employee of FCAAM to act as his innocent agent to take and carry away money by means of a wire transfer from the care, custody, control, and possession of ASL in Los Angeles to the fraudulent Kaplan account in Newport

Beach. This asportation was attributable to Bourque and his accomplice. Thus, Bourque, through false impersonation, successfully exercised dominion and control over the funds *prior* to the transfer of money from the FMB account in Kaplan's name to the Monex account. We are satisfied after reviewing all the evidence in this record that a reasonable jury could be convinced beyond a reasonable doubt that Morgan aided and abetted Bourque in his successful scheme to cause an FCAAM employee to act as their innocent agent in the taking and carrying away of the Kaplan funds by means of a wire transfer from American Savings and Loan Association to Farmer's and Merchant's Bank. The same evidence is sufficient to support Morgan's conviction for conspiracy to violate section 2113(b).

### B. Sufficiency Of The Evidence Of The Transportation Of Stolen Property In Interstate Commerce

Morgan asserts that any taking of money in Kaplan's account was "completed upon the transfer of money from FCAAM to Farmer's and Merchant's Bank." She then argues that the "Krugerrand coins were not property which had been stolen, within the meaning of § 2314." Thus, Morgan appears to contend that 18 U.S.C. § 2314 does not apply to the transportation of the proceeds of property that was stolen, converted or taken by fraud.

This issue presents questions of law which we review *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

█ Section 2314 prohibits the transportation of interstate commerce of goods or money, knowing the same to have been "stolen, converted or taken by fraud."[1] Contrary to Morgan's assertion, to sustain a conviction under section 2314, it is not

---

1. 18 U.S.C. § 2314, Transportation of stolen goods, securities, moneys, ... provides in pertinent part:

 Whoever transports in interstate ... commerce any goods, wares, merchandise, securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

necessary for the government to show that the precise object stolen, converted, or taken by fraud be transported. It is sufficient if the item transported is directly derived from the property stolen, converted, or taken by fraud. *United States v. Levy,* 579 F.2d 1332, 1337 (5th Cir.), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1978) (checks drawn on an account into which a fraudulently obtained check was deposited); *United States v. Pomponio,* 558 F.2d 1172, 1175 (4th Cir.1977) (cashier's check derived from a note fraudulently endorsed); *United States v. Walker,* 176 F.2d 564, 566 (2d Cir.) (cash and traveler's checks which were the proceeds of fraudulently obtained checks), *cert. denied,* 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949).

In this matter, the Krugerrands were directly traceable to the fraudulent taking and carrying away of funds in the care, custody, control and possession of ASL. In fact, the purchase of the Krugerrands was the object of the conspiracy to take and carry away Kaplan's funds deposited at ASL. Section 2314 is applicable to the interstate transportation of the fraudulently obtained Krugerrands.

The judgment is AFFIRMED.